UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KAREN M. KENNEY,

        Plaintiff,

                          Case No. 17-CV-11282

vs.

                          HON. GEORGE CARAM STEEH

ASPEN TECHNOLOGIES, INC.,

        Defendant.

_____/

## ORDER GRANTING DEFENDANT'S MOTION
## FOR SUMMARY JUDGMENT [ECF DOC. 17]

Plaintiff Karen Kenney ("Kenney") filed this action alleging that she was wrongfully terminated by her employer, defendant Aspen Technologies, Inc. ("Aspen"). In her two-count complaint, plaintiff alleges retaliation under Title VII of the Civil Rights Act of 1964 (Count I) and the Michigan Elliot Larsen Civil Rights Act ("ELCRA") (Count II). The matter is before the court on defendant's motion for summary judgment. The court heard oral argument on the motion on December 12, 2018. For the reasons stated below, defendant's motion for summary judgment is GRANTED.

## FACTUAL BACKGROUND

Aspen is a company located in Brighton, Michigan, that manufactures molded foam parts, primarily for the auto industry. Aspen's principal owner, Ken Beethem, holds 80% of the shares. Day-to-day operations are run by General Manager Keith Quinn. April Jewell was Aspen's HR Manager during the relevant period.

Beethem, Quinn and plaintiff have a long history working together. In the late 1990's, the three worked for Eagle Industries. In 2003, after leaving Eagle, they decided to form their own company. Beethem provided the financing and took an 80% share of Aspen. Quinn received a 20% share of Aspen, and then gave 1% from his share to plaintiff. Beethem was CEO, Quinn oversaw day-to-day operations, and plaintiff was responsible for the management of operations and supervision of the plant floor.

During her tenure at Aspen, from 2003 to 2008, plaintiff's management style was described by Quinn as "very harsh" with the employees. (Quinn dep. 26) Beethem testified that plaintiff created turmoil among the management group. (Beethem dep. 41-42) Quinn explained that plaintiff was harsh with employees, especially the women, and that she "create[ed] an atmosphere that people did not want to work in." (Quinn

dep. 46)  Plaintiff resigned her position with Aspen in 2008 and moved to Arizona.

In 2015, Aspen needed a Production Manager to help ramp up production for new parts programs it had acquired.  Beethem contacted plaintiff to discuss having her rejoin Aspen.    Plaintiff was offered the job because she knew Aspen's operations and would get up to speed quickly. (Quinn dep. 51-52)  Plaintiff moved back to Michigan and started her job with Aspen on May 1, 2015.

Upon plaintiff's return, Beethem, Quinn and Jewell described plaintiff's management style as abrasive, and said that she was responsible for many hourly workers leaving Aspen.  (Beethem dep. 51; Quinn dep. 52-59; Jewell dep. 69-71)  While acknowledging that Aspen always had an issue with hourly workers quitting, that number allegedly doubled after plaintiff returned to Aspen.  Jewell testified that 54 people quit in 90 days while plaintiff was employed, and 30-40 of those employees said they decided to quit because of plaintiff.  (Jewell dep. 70-71)  At this same time, Aspen was trying to hire more workers to expand its workforce.

However, there are no written records to support Aspen's contention that many of the 54 workers who quit did so directly because of plaintiff's

management style.  Aspen does name two employees who complained about plaintiff in writing.  A formal written complaint of harassment and discrimination was made on June 15, 2015 on behalf of hourly employee Jeerapan Fox.  Fox's husband outlined harassing behavior by plaintiff against Jeerapan – such as warnings for having food and her phone out at her station - as well as complaints about her production even though she was pregnant.  Quinn and Jewell met with plaintiff to discuss this complaint and to counsel plaintiff on her behavior.  (Quinn dep. 63-67; Jewell 61-67)  Quinn and Jewell believed that plaintiff listened to them.  *Id.*

Another employee, Sara Clapman, wrote a letter to Aspen claiming she was targeted by plaintiff: "At times I feel as though I am being harassed by your new director of production; since Karen has been back things have changed tremendously and not in a good way.  It seems like everyone, every day is on edge and I have heard nothing but complaints. . . . She targets people she doesn't like (especially women) which I find completely unfair."

Another incident involved plaintiff terminating Shannon Colgan, a long-term employee, for violating a new rule regarding cell phones.  Aspen instituted a new policy of not allowing employees to have phones on the

shop floor, with an exception for floor supervisors and team leaders because they needed their phones to communicate with management. Colgan was a floor supervisor. The new policy was announced to workers in a shift meeting. The same day, plaintiff saw Colgan using her phone to listen to music through headphones. Plaintiff contacted Beethem and recommended that Colgan be terminated. Beethem concurred in the decision. Quinn believed terminating Colgan was inappropriate and intervened. Beethem agreed and Colgan was reinstated with a 5-day suspension. Defendant believes that plaintiff did not present Beethem with the full picture when she asked for permission to terminate Colgan.

Beethem testified that he was aware of the issues plaintiff was causing in the plant, both from reports he received from Quinn and Jewell, as well as complaints he received directly from employees. (Beethem dep. 50-51, 55) Beethem contends that he spoke to plaintiff seven or eight times during the three months she was employed, but her performance did not improve. (Beethem dep. 55) He then made the decision to terminate plaintiff. On July 31, 2015 Beethem terminated plaintiff in his conference room. Nobody else was present. Beethem did not take any notes, but testified that he told plaintiff that "based on what we are doing . . . we are

going in different directions" and "what she is doing is not working." (Beethem dep. 56)  Jewell recommended that plaintiff be terminated and Quinn agreed with the decision.  (Jewell dep. 28-29, 78-79; Quinn dep. 52-53)  The termination letter given to plaintiff stated that the decision was made collectively.

Plaintiff alleges that she was terminated in retaliation for protected activity.  The protected activity stems from conversations plaintiff had with Jewell and Quinn in mid-May regarding where Aspen advertised for employees.  (Complaint, ¶¶ 12-17)  Plaintiff contends that Jewell told her that Aspen only advertised in Livingston and Oakland counties because Beethem did not like the "demographics" of the people who resided in Detroit or Flint.  (Complaint, ¶ 13)  Plaintiff testified that Jewell and Quinn each told her that Beethem did not like black people.  (Keeney dep. 57-58)  Plaintiff alleges she told both Jewell and Quinn that "[t]his was [an] illegal" hiring practice.  (Complaint, ¶ 15, 17)  Plaintiff testified that she did not speak directly to Beethem about this allegation.  (Kenney dep. 62)

Jewell admitted that she and plaintiff had a conversation about recruiting practices because plaintiff wanted to know what was being done to get candidates in the door.  Jewell explained that Aspen did not

advertise in the newspaper, but only recruited on the Internet. (Jewell dep. 43-48) Jewell denies that there was any allegation of racial discrimination or other discriminatory recruiting practices. (Jewell dep. 56-57) Quinn also testified that plaintiff asked him about recruiting, but that she never raised the issue of racial discrimination. (Quinn dep. 15)

Plaintiff testified that she based her claim of retaliatory discharge on the fact that "[t]here would be no other reason. I have no documented disciplinary action or other conversations or actions against me for the short duration of my employment, so I am not sure what else I should believe would be the reason for termination." (Kenney dep. 83-84)

In her deposition, plaintiff said she and Quinn discussed an issue regarding unemployment claims that were made against Aspen in the interim period between plaintiff's first and second periods of employment with Aspen. During a slow period some employees claimed unemployment when they were working less than full time. When work picked up, some of those employees continued to collect unemployment benefits. Aspen brought this to the attention of the unemployment agency and a number of the employees were required to repay benefits wrongfully received. Plaintiff alleges that Beethem "zeroed in on" three black employees, even

though he did not target white employees who participated in the same behavior. (Keeney dep. 66-68) Those employees who failed to make repayment were charged with fraud by the unemployment agency. Three employees pled guilty to felony fraud charges and were ordered to repay the unemployment agency. These employees are still employed by Aspen. Plaintiff referred to the claims in her deposition as evidence to support her contention that Beethem was a racist. She did not include this incident in her complaint. The record evidence regarding this incident does not raise a genuine issue of material fact as to whether the employer acted out of racial animus in this case.

In 2015, of the 163 hourly production workforce at Aspen, 28 or 17% were African American. The population of Livingston County, where the plant is located, is 0.4% African American.

After her termination, plaintiff filed a charge with the EEOC, obtained a right-to-sue letter, and filed the instant lawsuit for retaliation in violation of Title VII and ELCRA.

## STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to

interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001). "[T]he mere existence of *some* alleged factual dispute between the parties will not

defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. *McLean*, 224 F.3d at 800 (*citing Anderson*, 477 U.S. at 252).

<u>ANALYSIS</u>

## I.  Prima Facie Case of Retaliation

Title VII and ELCRA protect employees from retaliation for having opposed an employer's unlawful actions. 42 U.S.C. § 2000e-3(a), Mich. Comp. Laws § 37.2701(a).[1]  Plaintiff contends that she engaged in protected activity when she complained to Jewell and Quinn about Aspen's race-based hiring practices and Beethem's race-based discrimination, and that defendant retaliated against her by terminating her employment.

To establish a prima facie case of retaliation, a plaintiff must demonstrate that (1) she engaged in a protected activity; (2) her employer knew of her exercise of her protected rights; (3) her employer took an adverse employment action against her; and (4) there was a causal connection between the protected activity and the adverse employment action. *Weigel v. Baptist Hosp. of E. Tennessee*, 302 F.3d 367, 381 (6th Cir. 2002); *Allen v. Mich. Dep't of Corr.,* 165 F.3d 405, 413 (6th Cir.1999).

---

[1] The same rubric applies to retaliation claims under both Title VII and ELCRA.  *See Pena v. Ingham County Road* Comm'n, 255 Mich. App. 299, 311, n.3 (2003).

## A.    Protected Activity

Plaintiff identifies two incidents as protected activity for purposes of stating a prima facie case of retaliation.  First, plaintiff contends that she opposed discriminatory hiring practices by telling Jewell and Quinn that what they were doing was illegal.  An employee is protected against employer retaliation for opposing any practice that the employee reasonably believes to be a violation of Title VII, "whether or not the challenged practice ultimately is found to be unlawful."  *Johnson v. University of Cincinnati*, 215 F.3d 561, 579-80 (6th Cir. 2000).

Complaining to anyone about allegedly unlawful practices is considered to be opposing conduct.  *Id.*  "[T]here is no qualification on who the individual doing the complaining may be or on the party to whom the complaint is made known . . . ."  *Id.* at 580.  "The only qualification that is placed upon an employee's invocation of protection from retaliation under Title VII's opposition clause is that the manner of his opposition must be reasonable."  *Id.*  While Jewell and Quinn deny plaintiff's allegations of racially discriminatory hiring practices, they acknowledge the conversations about hiring practices in general took place.

The second protected activity that plaintiff alleges she engaged in was telling Quinn that it was unlawful that black employees who committed fraud against the unemployment agency were prosecuted at Beethem's insistence, while white employees who engaged in the same practices were not prosecuted.

Viewing the facts in the light most favorable to plaintiff shows she reasonably believed that Aspen was discriminating against black applicants and employees, and that she complained about it to defendant. Therefore the first element of plaintiff's prima facie case is satisfied.

## B.     Defendant's Knowledge

"[T]he decisionmaker's knowledge of the protected activity is an essential element of a prima facie case of unlawful retaliation." *Frazier v. USF Holland, Inc.*, 250 Fed.Appx. 142, 148 (6th Cir. 2007) (finding that plaintiff failed to establish prima facie case where evidence did not reflect that employer was aware of prior discrimination charge) (citing *Mulhall v. Ashcroft*, 287 F.3d 543, 551 (6th Cir. 2002)). According to plaintiff, she raised her complaints to Jewell and Quinn, but not directly to Beethem.

Defendant argues that Beethem was the one who made the decision to terminate plaintiff's employment and he had no knowledge of her

protected activity.  However, there is evidence that Jewell, Quinn and Beethem collectively made the decision to terminate plaintiff.  This is supported by plaintiff's termination letter, as well as Jewell's letter to the EEOC stating that the decision to terminate plaintiff was made by all three of them.  In addition, Quinn testified that Beethem would not have terminated plaintiff if Quinn had not concurred in the decision, and Jewell testified that she recommended to Beethem that plaintiff be terminated.

There is genuine dispute of material fact regarding who made the decision to terminate plaintiff.  Plaintiff has met the second element of her prima facie case.

### C.    Adverse Employment Action

It is undisputed that plaintiff was terminated which is an adverse employment action.

### D.    Causal Connection

To establish the element of causation, a plaintiff bears the minimal burden of putting forth some evidence "sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *E.E.O.C. v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997) (citations omitted).  Evidence that an adverse action was taken shortly after

a plaintiff's exercise of protected rights is relevant, but temporal proximity alone will not support a finding that the protected activity and the adverse action were connected. *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000). Causation can also be shown where an employee is subjected to higher disciplinary scrutiny than similarly situated employees, *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 364–65 (6th Cir. 2001), or if the employee faced higher scrutiny than she faced before engaging in the protected activity. *Cantrell v. Nissan N. Am. Inc.*, 145 Fed. Appx. 99, 106 (6th Cir. 2005).

Plaintiff commenced her employment with Aspen on May 1, 2015. In mid-May she allegedly complained about discriminatory hiring and employment practices. She was terminated two and a half months later at the end of July. Plaintiff argues that the reason given for her termination, her management style, makes no sense when Quinn and Beethem arguably hired her *because* of her management style. Plaintiff contends she was subjected to heightened scrutiny for behaviors that defendant knew to exist, which along with temporal proximity is sufficient to meet her burden of showing a causal connection for stating a prima facie case. The

court, however, is hard pressed to accept this argument without any evidence of heightened scrutiny by defendant.

Defendant also points out that the large number of employees who quit and the written complaints regarding plaintiff's treatment of Jeerapan Fox and Sarah Clapman occurred after plaintiff engaged in the allegedly protected activity.   It is the law in the Sixth Circuit that "an intervening legitimate reason" to take an adverse employment action "dispels an inference of retaliation based on temporal proximity." *Kuhn v. Washtenaw Cty.*, 709 F.3d 612, 628 (6th Cir. 2013) (extended discretionary leave that caused a shortage of deputies in the Sheriff's Office constituted an intervening reason for the County to terminate plaintiff's employment); *see also Wasek v. Arrow Energy Services, Inc.*, 682 F.3d 463, 472 (6th Cir. 2012) (oil rig worker who had complained about sexual harassment to his superiors, but who subsequently left his worksite without authorization, had engaged in an intervening event that gave his employer a legitimate reason to discipline him).  Where the documented employee complaints about plaintiff, as well as the unusually large number of employees who quit, occurred or continued after plaintiff engaged in the protected activity, there is an intervening event that replaces an inference of temporal proximity.

Viewing the facts in the light most favorable to plaintiff, she has failed to provide any evidence aside from temporal proximity alone that links her protected activity to her termination.  Furthermore, there is evidence of intervening legitimate reasons for defendant to take an adverse employment action which "dispels an inference of retaliation based on temporal proximity" in this case.  *See id.*

To establish a prima facie case, a plaintiff must present some evidence to support an inference that the adverse employment action was taken in retaliation for the protected activity.  *See Nguyen*, 229 F.3d at 567. Plaintiff fails to present evidence to support a causal connection between her protected activity and the adverse employment action.  Having failed to set forth a prima facie case of retaliation under Title VII, the court is constrained to grant defendant's motion for summary judgment.

## CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is GRANTED.

Dated:  December 19, 2018

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on December 19, 2018, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk